## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.:_____

**CARLOS GOMEZ**, an individual,

     Plaintiff,

vs.

**WELLS FARGO BANK, N.A.**, successor in
interest of WACHOVIA BANK, N.A., which
was successor in interest of FIRST UNION
BANK, N.A.

     Defendant,

_____/

## COMPLAINT

Plaintiff, CARLOS GOMEZ ("GOMEZ"), an individual, by and through undersigned counsel, sues Defendant WELLS FARGO BANK, N.A., successor in interest of Wachovia Bank, N.A., which was successor in interest of First Union Bank, N.A. ("WELLS FARGO), and alleges:

## SUMMARY OF ACTION

1.      This matter is a result of two significant failures of WELLS FARGO, both of which led to other significant failures and to GOMEZ being arrested in front of his wife and two young daughters, imprisoned in a federal jail for almost two (2) weeks on charges that carried a twenty (20) year prison sentence, losing his job and spending almost eight (8) months on house arrest before clearing his name of all charges by proving that the information relating to him provided by WELLS FARGO to the U.S. Government was inaccurate, incomplete, false and misleading.

2.      The first failure was WELLS FARGO's abject failure to secure and protect private and confidential account information of its customers from being improperly used by others and WELLS FARGO's employees, including NOEL ABRAHAM MENDEZ ("MENDEZ"), which resulted in MENDEZ and others, in late 2005 through the middle of 2006: (i) opening a new account under GOMEZ's name without GOMEZ's authorization and without the documentation and approvals required to open the account; (ii) changing the mailing address on the improperly opened account so that GOMEZ did not receive notice of the improperly opened account and its transactions; and (iii) improperly removing in excess of $1.1 million dollars from two WELLS FARGO accounts and laundering $135,000.00 of the $1.1 million through the improperly opened account, which opening balance was at least two hundred and seventy (270) times higher than the average daily balance of any account GOMEZ held at WELLS FARGO.

3.      The second failure was WELLS FARGO's deliberate failure to provide the U.S. Government with accurate and complete information relating to GOMEZ, which inaccurate and incomplete information led to GOMEZ's arrest and incarceration.  Specifically, in early 2008, when it falsely informed the U.S. Government that a WELLS FARGO account used to launder money belonged to GOMEZ, WELLS FARGO knew or should have known, but did not inform the U.S. Government, that MENDEZ and others: (i) devised and implemented a money laundering scheme that resulted in $1.1 million dollars being removed from the accounts of two WELLS FARGO customers, (ii) improperly opened an account used to launder some of the money in GOMEZ's name without his authorization and without proper documentation and internal approvals, and (iii) laundered $135,000.00 of the $1.1 million through the unauthorized

and improperly opened account without GOMEZ's knowledge or involvement using a signature for GOMEZ that WELLS FARGO's employees noted did not match GOMEZ's real signature.

## PARTIES, JURISDICTION AND VENUE

4.  This is a civil action for monetary damages in excess of seventy-five thousand dollars ($75,000.00), exclusive of costs, interest and attorney's fees.

5.  Plaintiff GOMEZ is an individual over the age of eighteen who resides in Miami-Dade County, Florida and is otherwise *sui juris*.

6.  Defendant WELLS FARGO is a foreign national banking association with a principal place of business in San Francisco, California that is authorized to and doing significant business in Miami-Dade County, Florida.

7.  Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because this matter is for an amount in excess of $75,000.00, exclusive of interest, costs and attorney's fees and is a dispute between citizens of different states.

8.  Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to the cause of action arose in and the defendant is subject to jurisdiction in Miami-Dade County, Florida.

9.  GOMEZ has complied with all conditions precedent to pursuing this action or said conditions have been waived or have otherwise occurred.

HERNANDEZ LEE, LLC
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

## FACTUAL ALLEGATIONS

## GOMEZ'S REAL ACCOUNTS AT WELLS FARGO

10.     In 1997, GOMEZ, a former U.S. Marine and then resident of Connecticut, opened a savings account, account no. 3000013401004 ("Real Savings Account"), and a checking account, account no. 1030002564869 ("Real Checking Account") with First Union Bank, N.A. ("First Union"), which merged with Wachovia Bank, N.A., ("Wachovia") in September 2001, which was acquired by WELLS FARGO in 2008.

11.     The Real Savings Account and Real Checking Account will be collectively referred to herein as the "Real Accounts."

12.     First Union provided GOMEZ with an account card ("Account Card") that listed the account numbers of the Real Accounts and informed GOMEZ that he had a daily purchase limit of $1,200.00 ("Daily Purchase Limit").  A copy of the Account Card is attached hereto as **Exhibit A**.

13.     In November 1998, after moving to California in connection with his U.S. Marine training, GOMEZ filled out a signature card ("California Signature Card") on First Union paperwork to show his change in address from Connecticut to his California address, which was 300B Marine Drive, Oceanside, CA 92054.  A true and correct copy of the California Signature Card is attached hereto as **Exhibit B**.

14.     In December 2001, GOMEZ relocated from California to Kendall, Florida and in January 2002, filled out a signature card ("Kendall Signature Card") on First Union paperwork to show his change in address from California to his Kendall address, which was 14831 S.W. 80th

Street, Miami, Florida 33193 (the "Real Kendall Address").  A true and correct copy of the Kendall Signature Card is attached hereto as **Exhibit C**.

15.     The Real Accounts were continually in overdraft status and subject to bank fees because their balances did not meet the minimum balance requirement to avoid bank fees. Consequently, in 2002, GOMEZ removed what little monies he had in the Real Accounts and allowed them to close.

16.     During the time they were open, the average daily balance of the Real Accounts did not ever exceed $500.00.  Further, during the time they were open, the Daily Purchase Limit of the Real Accounts was not increased above the $1,200.00 per day limit noted on the Account Card.

## MENDEZ'S MONEY LAUNDERING SCHEME INVOLVING THE S/R AND B-B ACCOUNTS OF WELLS FARGO'S CUSTOMERS

17.     On or around November 2005, MENDEZ, a WELLS FARGO employee that is currently incarcerated in a federal prison in Miami-Dade County, Florida, and his grandmother Emma Grismalda Casanova ("Casanova") devised and implemented a scheme to improperly launder monies that belonged to two WELLS FARGO customers.

18.     In furtherance of the scheme, MENDEZ identified WELLS FARGO account ending no. 4111 in the name of Mrs. J.S. – deceased and Miss Gabriela Rossova (the "S/R Account").  The S/R Account, which had a balance of over $715,000.00 as of November 2005, was opened on February 27, 1995, and was designated with a hold mail status, which meant the account's holder did not receive statements or other correspondence relating to the account.

19.     On or about November 10, 2005, MENDEZ accessed the computerized records of the S/R Account and changed the address on the account from hold mail to a ***new*** fictitious address in Colombia, South America: Carrera 22, #44B, Bogota, Colombia.  Remarkably, WELLS FARGO did not notice and/or conveniently ignored this significant change to an account that had previously been designated with a hold mail status.

20.     Consequently, ten (10) days later on November 16, 2005, Casanova walked into a WELLS FARGO branch in Miami and withdrew the entire balance of the S/R Account.

21.     Specifically, on November 16, 2005, armed with a fake passport in the name of Gabriela Rossova with the fake address that was added to the S/R Account ten (10) days earlier by MENDEZ, Casanova walked into a Miami branch of WELLS FARGO, filled out an affidavit of lost certificate of deposit for the S/R Account stating that she is the lawful owner of the certificate of deposit for the S/R Account and that she has no knowledge of the "whereabouts or who has possession" of the certificate of deposit of the S/R Account, and withdrew $718,234.39 from the S/R Account without raising any fraud alarms with WELLS FARGO's system or employees.

22.     On or about February 14, 2006, MENDEZ accessed the computerized records of a certificate of deposit account ending with 7081 in the name of F. B-B (the "B-B Account").  The B-B account, which had a balance of $439,706.19 as of February 14, 2006, was opened on October 6, 2000, and like the S/R Account, had a hold mail status.

23.     Unlike the S/R Account, the B-B account did not list Gabriela Rossova as an account holder.  On February 14, 2006, MENDEZ changed the names on the B-B Account from F. B-B to F. B-B ***and*** Gabriela Rossova.  Additionally, MENDEZ changed the status of the B-B

Account from hold mail to add the same **_new_** fictitious Colombian address he had previously added to the S/R Account in November 2005.

24.     Again, WELLS FARGO somehow missed and/or ignored the fact that Gabriela Rossova, who recently withdrew over $715,000.00 from the S/R Account, was now named as a holder of the B-B Account, that the B-B Account, like the S/R Account was changed from hold mail status, and that the B-B and S/R Accounts had the same fictitious address in Colombia, South America despite the accounts being opened at different times by different people.

25.     On February 17, 2006, three (3) days after being added to the B-B Account, Casanova visited a WELLS FARGO branch in Miami, identified herself as Gabriela Rossova, produced her fake Colombian passport with the fake Colombian address added to the S/R and B-B Accounts by MENDEZ, and attempted to withdraw the entire balance of the B-B Account.

26.     The WELLS FARGO employee that was helping Casanova, however, refused to allow her to withdraw the monies from the B-B Account because of potential fraud, made note of the fact that Casanova had recently visited the bank as Gabriela Rossova, and placed the following warning note on the account:

> GABRIELA WANTED TO REDEEM CD. PRESENTED COLOMBIAN PASSPORT BUT LOOKS FAKE. PASSPORT DOES NOT HAVE US VISA ON IT, NOR US ENTRY STAMP. **_CUSTOMER SAYS SHE CAME INTO US JUST THREE MONTHS AGO_**. ASKED HER TO BRING ME PROPER ID (PASSPORT WITH US VISA & ENTRY DATE STAMP)
>
> PLEASE VERIFY THOROUGHLY BEFORE REDEEMING CD.  SEE SOLO(?) NOTES FOR GRABRIELA (sic) ROSSOVA. (Emphasis added).

27.     Later the same morning of February 17, 2006, Casanova went to the WELLS FARGO branch in Miami where MENDEZ was working.  During that visit, MENDEZ allowed Casanova to withdraw the entire balance of the B-B Account, which amount totaled $439,706.19, and closed the account.

28.     MENDEZ also made a fraudulent note to the B-B Account, which conflicted with the note placed on the account by the WELLS FARGO employee that did not allow Mendez to remove the monies from the B-B Account.  The fraudulent note made by MENDEZ stated:

> MRS (sic) ROSSOVA CAME IN EXTREMELY UPSET ABOUT THE FACT THAT SHE COULD NOT CLOSE HER CD IN A LOCAL BRANCH, EXPLAINED SHE WAS EXTREMELY INSULTED BASED ON THE FACT THAT SHE HAS BEEN A CLIENT FOR SUCH A LONG TIME.  I CALLED THE REP. AT THE BRANCH AND HE EXPLAINED THAT HE DID NOT FEEL COMFORTABLE BASED ON THE FACT THAT IT WAS SUCH A LARGE AMOUNT. I COLLECTED THE CLIENT'S PASSPORT COPY WHICH DID INCLUDE AN ENTRY STAMP, AS WELL AS A COLOMBIAN DL AND VOTER REGISTRATION; FURTHERMORE I VERIFIED THAT THE PASSPORT # WAS THE SAME ON CDI.  MADE COPIES OF ALL RELEVANT ID'S AND FILED.  MS ROSSOVA WANTED TO CLOSE ACCOUNT EXPLAINED THAT DAUGHTER HAS EXISTING BANK ACCT WITH BANK OF AMERICA AND WANTS FUNDS TO BE MANAGED BY HER, SINCE SHE WILL BE TRAVELING BACK TO BOGOTA.

29.     WELLS FARGO somehow missed and/or ignored the conflicting notes and signs of fraud with respect to the B-B Account.

30.     As a result of WELLS FARGO's failure to adequately protect the confidential information of its account holders from misuse by others, including WELLS FARGO's employees, MENDEZ was able to remove in excess of $1.1 million from the S/R and B-B Accounts.

31.     MENDEZ and Casanova then devised a scheme to launder the $1.1 million that was improperly removed from the S/R and B-B Accounts.   Specifically, MENDEZ and Casanova distributed some or all of the proceeds from the S/R and B-B Accounts among various other accounts at WELLS FARGO and other banks, including the Fraud Account as defined below.

32.     MENDEZ and Casanova then devised a scheme and caused the monies deposited in the various accounts, including the Fraud Account, to be withdrawn in amounts below $10,000.00 in order to evade federal law that requires the reporting of transactions of more than $10,000.00.

## MONEY LAUNDERING SCHEME THROUGH FAKE GOMEZ ACCOUNT

33.     In November 2005 and while still an employee of WELLS FARGO, MENDEZ and other unknown WELLS FARGO employees opened account no. 1010135506361 ("Fraud Account"), under GOMEZ's name and, for reasons only known by MENDEZ and others, deposited $135,100.00 of the monies from the S/R Account into the Fraud Account via the following deposits:

           November 21, 2005   - $    100.00
           November 25, 2005   - $ 15,000.00
           December 2, 2005    - $ 80,000.00
           December 13, 2005   - $ 40,000.00

34.     The $135,100.00 opening balance of the Fraud Account was at least two hundred and seventy (270) times greater than the average daily balance of GOMEZ's Real Accounts, which were closed in 2002.

35.     The average daily balance of the Fraud Account during the first month of the five months it was opened was at least one hundred and forty four (144) times greater than the average daily balance of GOMEZ's Real Accounts.

36.     MENDEZ and/or other unknown WELLS FARGO employees opened the Fraud Account without GOMEZ's authorization and without the documentation and approvals required for opening an account.

37.     MENDEZ and/or other unknown WELLS FARGO employees then changed the Real Kendall Address on file for GOMEZ to an address in Hialeah, Florida, which was 130 West 14th Street, Hialeah, Florida 33010 (the "Hialeah Address") without GOMEZ's authorization and proper documentation.   MENDEZ and/or other unknown WELLS FARGO employees then linked the Hialeah Address to the Fraud Account.

38.     During the third month of the five-month existence of the Fraud Account, MENDEZ and/or other unknown WELLS FARGO employees changed the address on the Fraud Account from the Hialeah Address used to open the account to a new Kendall, Florida address, which was 8951 S.W. 72nd Street, Apt. 307, Miami, Florida 33173 (the "Fake Kendall Address"). This second change in address was also not authorized by GOMEZ and was done without proper documentation and approvals.

39.     As a result of the various address changes made under his name, GOMEZ was not aware of the fraudulent transactions being perpetuated under his name by MENDEZ and others with respect to the Fraud Account.

HERNANDEZ LEE, LLC
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

40.     The Fraud Account was closed in April 2006. During the time it was open, MENDEZ and others issued checks and made other withdrawals from the Fraud Account until the entire balance of the account was depleted.

41.     To be more specific, MENDEZ and others withdrew approximately $125,521.52 or ninety-two percent (92%) of the $135,100.00 opening balance of the Fraud Account during the first two months of the account's brief five (5) month existence and withdrew the remaining balance over the remaining months.

42.     For example, MENDEZ and others withdrew the following amounts from the Fraud Account before it was closed:

            Nov. 2005 – Dec. 2005      - $  11,402.17
            Dec. 2005 – Jan.2006       - $114,119.35
            Jan. – Feb. 2006           - $  15,900.00
            Feb. - March 2006          - $   1,060.95
            March – April 2006         - $   1,517.53 (account closed)

43.     MENDEZ and others first started withdrawing monies from the Fraud Account via checks during the second month of the account's existence. Specifically, during the second month of the account's existence, MENDEZ and others withdrew $90,000.00 via checks.

44.     The purported GOMEZ signature on the checks drawn on the Fraud Account, however, did not match GOMEZ's signature on file, which was the same signature on the California and Kendall Signature Cards and the signature on the checks drawn on the Real Checking Account.

45.     During the time the Fraud Account was open, other WELLS FARGO employees observed and made notes on the Fraud Account that the purported GOMEZ signature on the checks drawn on the Fraud Account did not match the GOMEZ signature on file.

HERNANDEZ LEE, LLC
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

46.     For example, a WELLS FARGO employee reversed check no. 1092, the ***first*** check by number and the ***second*** check by date drawn on the Fraud Account, and did not allow the check to be drawn on the Fraud Account because of the questionable GOMEZ signature on the check.  The monies associated with check no. 1092 were later withdrawn from the Fraud Account via other means.

47.     Despite a WELLS FARGO employee raising signature and fraud issues with check 1092, MENDEZ and others were able to continue issuing checks totaling $105,900.00 against the Fraud Account using the same questionable GOMEZ signature used on check 1092 without raising any fraud alarms with WELLS FARGO's employees or system.

48.     With the exception of one check of $40,000.00, drawn on the Fraud Account and payable to Gabriela Rossova, the remaining checks were all for amounts close to, but below $10,000.00.

49.     All of the checks drawn on the Fraud Account, including the checks to Gabriela Rossova, were made within a day or two of each other, and consequently should have raised fraud alarms at WELLS FARGO and should have been reported by WELLS FARGO to the U.S. Government as structured transactions.

50.     For example, the following checks, payable to the noted persons, were drawn on the Fraud Account:

| CHECK NO. | DATE | PAYEE | AMOUNT |
|---|---|---|---|
| 1092 | 1/18/06 | Miladys Camacho | $8,900.00 |
| 1093 | 1/17/06 | Miladys Camacho | $7,850.00 |
| 1097 | 1/17/06 | Miladys Camacho | $9,200.00 |
| 1099 | 1/19/06 | Miladys Camacho | $7,700.00 |
| 1100 | 1/19/06 | Gabriela Rossova | $40,000.00 |

**HERNANDEZ LEE, LLC**
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

| 1102 | 1/20/06 | Amaury Medina | $8,600.00 |
| 1105 | 1/18/06 | Amaury Medina | $7,750.00 |
| 1103 | 1/23/06 | Miladys Camacho | $7,000.00 |
| 1121 | 2/13/06 | Gabriela Rossova | $8,900.00 |

51.     Interestingly, WELLS FARGO somehow missed and/or ignored the fact that checks totaling $48,900.00, were drawn on the Fraud Account by a Gabriela Rossova, and that both checks to Gabriela Rossova were drawn after a Gabriela Rossova removed the entire balance of the S/R Account and before MENDEZ added her to and allowed her to withdraw the entire balance of the B-B Account.

52.     WELLS FARGO also ignored the fact that other withdrawals made as purchases on the Fraud Account exceeded the Daily Purchase Limit of $1,200.00, which was placed on the Real Accounts to prevent fraud and/or minimize fraud losses with respect to the Real Accounts.

53.     Specifically, WELLS FARGO ignored the fact that during December 2005, the second month of the Fraud Account's brief existence, approximately thirty-eight percent (38%) of the daily purchases exceeded the Daily Purchase Limit, despite the fact that the Daily Purchase limit on the Real Accounts had not been increased above $1,200.00 per day.

54.     For example, purchases totaling the following amounts were made on the following dates:

        12/09/2005 -   $1,915.13
        12/15/2005 -   $1,883.26
        12/19/2005 -   $1,855.37
        12/21/2005 -   $4,863.48
        12/22/2005 -   $2,188.07
        12/23/2005 -   $2,290.59

**WELLS FARGO REPORTING INCOMPLETE, INACCURATE, FALSE AND
MISLEADING INFORMATION ABOUT GOMEZ TO THE U.S. GOVERNMENT
WHICH LED TO GOMEZ'S ARREST, INCARCERATION AND HOUSE ARREST
BEFORE HE CLEARED HIS NAME**

55.     On or before January 2008, WELLS FARGO informed the U.S. Government about GOMEZ and his purported connection to accounts WELLS FARGO claimed belonged to GOMEZ.

56.     Further, in January 2008, WELLS FARGO provided to the U.S. Government information WELLS FARGO claimed pertained to GOMEZ's accounts at WELLS FARGO.

57.     Among the information WELLS FARGO provided to the U.S. Government was a summary sheet (the "Summary Sheet") that lists two accounts as belonging to GOMEZ and identifies the number of statements and signature cards on file for the listed accounts.  A true and correct copy of the Summary Sheet is attached hereto as **Exhibit D**.

58.     The information WELLS FARGO provided to the U.S. Government, including the information on the Summary Sheet was incomplete, inaccurate, false and misleading, and WELLS FARGO knew or should have known this when it provided information to the U.S. Government.

59.     For example, the Summary Sheet lists two accounts as belonging to GOMEZ. The first was account number 01120002306338 ("Non-Gomez Account"), which was closed in 1999, and the second was the Fraud Account, bearing account number 1010135506361.

60.     As evident from the Account Card that lists GOMEZ's Real Accounts, which are the *only* accounts GOMEZ held at WELLS FARGO, the Non-Gomez Account and the Fraud Account *never* belonged to GOMEZ.

61.     WELLS FARGO knew or should have known that the Non-Gomez and Fraud Accounts did not belong to GOMEZ, but nonetheless falsely informed the U.S. Government and provided a Summary Sheet falsely indicating that the Non-Gomez and Fraud Accounts belonged to GOMEZ.

62.     The Summary Sheet, however, did not list GOMEZ's Real Accounts.

63.     When it provided information about GOMEZ and the Summary Sheet to the U.S. Government, WELLS FARGO knew or should have known about GOMEZ's Real Accounts, but did not inform the U.S. Government of their existence and did not provide any information relating to such accounts.

64.     When it provided information about GOMEZ and the Summary Sheet to the U.S. Government, WELLS FARGO knew or should have known that GOMEZ's Real Accounts were closed in 2002 because they were continually in overdraft status and subject to bank fees and that additional information and approvals required when an overdraft customer reopens an overdraft account or a new account did not exist.

65.     When it provided information about GOMEZ and the Summary Sheet to the U.S. Government, WELLS FARGO knew or should have known that MENDEZ and/or other WELLS FARGO employees opened the Fraud Account and changed the address on the Fraud Account from the Real Kendall address on file for GOMEZ without GOMEZ's knowledge, authorization, or consent and without the required documentation and approvals.  In fact, WELLS FARGO knew or should have known that GOMEZ had absolutely nothing to do with the Fraud Account.

66.     WELLS FARGO, however, did not inform the U.S. Government that MENDEZ and/or other WELLS FARGO employees opened the Fraud Account and changed the address on the account without GOMEZ's authorization, knowledge or consent and without the required documentation and approvals and that GOMEZ had nothing to do with the Fraud Account.

67.     When it provided information and the Summary Sheet to the U.S. Government, WELLS FARGO knew or should have known that the average daily balance of the Real Accounts never exceeded $500.00, and that the opening balance of the Fraud Account was at least two hundred and seventy (270) times greater than the average daily balance of GOMEZ's Real Accounts.

68.     WELLS FARGO, however, did not inform the U.S. Government that the opening balance of the Fraud Account was at least two hundred and seventy (270) times greater than the average daily balance of GOMEZ's Real Accounts.

69.     The U.S. Government only became aware of GOMEZ's Real Accounts after GOMEZ luckily located information about his Real Accounts in an old box with his military information and provided the information about his Real Accounts to the U.S. Government, which information he used to prove his innocence and secure a November 14, 2011, court order dismissing the charges against him.

70.     Specifically, GOMEZ used the information relating to the Real Checking Account he provided to the U.S. Government to prove that: (i) his last transactions with WELLS FARGO were in 2002, (ii) he never had access to $135,000.00, the amount used to open the Fraud Account, (iii) the last address on file for his accounts with WELLS FARGO was the Real Kendall Address and not the Hialeah or the Fake Kendall Addresses on the Fraud Account, and

HERNANDEZ LEE, LLC
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

(iv) the signature on the checks drawn on the Fraud Account did not match the signature on the checks drawn on the Real Checking Account.

71.     When it provided information and the Summary Sheet to the U.S. Government, WELLS FARGO knew or should have known of MENDEZ's and Casanova's money laundering scheme involving the S/R and B-B Accounts and MENDEZ's and Casanova's connection to the Fraud Account.

72.     WELLS FARGO, however, did not inform the U.S. Government about MENDEZ's and Casanova's money laundering scheme and their connection to the Fraud Account.

73.     Instead, WELLS FARGO provided to the U.S. Government information falsely linking GOMEZ to the Fraud Account to deflect from WELLS FARGO's failure to adequately protect the assets and confidential and private information of its customers from being misused by WELLS FARGO's employees, including MENDEZ, who remained employed by WELLS FARGO until about June 2006, almost seven (7) months after he first began his money laundering scheme.

74.     The Summary Sheet also indicates that there were two (2) signature cards signed by GOMEZ for the Fraud Account.

75.     That information was also false and misleading.

76.     As an initial matter, because there was no activity on GOMEZ's Real Accounts since 2002, a new signature card was required to be filled out by GOMEZ for any account opened in 2005.

77.    WELLS FARGO did not have any signature cards signed by GOMEZ with respect to the Fraud Account, which was opened in 2005.

78.    First Union and Wachovia merged in September 2001 to become Wachovia Corporation and had combined their operations and paperwork under the Wachovia name by November 2005, the month the Fraud Account was opened.

79.    Thus, paperwork used to open the Fraud Account would be on Wachovia paperwork instead of First Union paperwork.

80.    When it provided information and the Summary Sheet to the U.S. Government, WELLS FARGO did not have any paperwork, including signature cards, signed by GOMEZ on Wachovia paperwork.

81.    The only signature cards that WELLS FARGO had on file were the California and Kendall Signature Cards, which WELLS FARGO knew were signed by GOMEZ in 1998 when he changed his address from Connecticut to California, and in 2002 when he changed his address from California to Kendall, Florida, respectively.

82.    Despite the fact that First Union and Wachovia had combined operations and paperwork under the Wachovia name by November 2005, that WELLS FARGO did not have any signature cards signed by GOMEZ on Wachovia paperwork, that the California and Kendall Signature Cards had nothing to do with the Fraud Account, and that WELLS FARGO did not have a new signature card signed by GOMEZ in 2005, WELLS FARGO falsely informed the U.S. Government that the California and Kendall Signature Cards were signed by GOMEZ with respect to the Fraud Account.

83.     WELLS FARGO never informed the U.S. Government that the California and Kendall Signature Cards were only associated with GOMEZ's Real Accounts and had nothing to do with the Fraud Account or that GOMEZ had not signed the signature card required to open the Fraud Account.

84.     As a direct result of WELLS FARGO providing incomplete, false and misleading information relating to GOMEZ to the U.S. Government in 2008, the U.S. Government arrested GOMEZ on or about April 5, 2011, in front of his two young daughters and his wife and charged him with conspiracy to commit money laundering, conspiracy to structure financial transactions, and structuring financial transactions.  The charges had a maximum penalty of 20, 5 and 5 years imprisonment, respectively.

85.     GOMEZ was working at United Parcel Service ("UPS") at the time of his arrest and lost his job as a result of the arrest and remained incarcerated for almost two (2) weeks.

86.     After he was released from federal prion, GOMEZ, who did not have a prior criminal record or offense, was placed on house arrest for almost eight (8) months, during which time he could only leave his house for work and to report to a probation officer.

87.     GOMEZ was finally able to clear his name of all charges after he proved to the U.S. Government that the information relating to him provided by WELLS FARGO to the U.S. Government was inaccurate, incomplete, false and misleading.

**PROBLEM OF EMPLOYEES OPENING ACCOUNT WITHOUT PROPER DOCUMENTATION WAS A SYSTEMIC PROBLEM THAT WAS IGNORED FOR FINANCIAL GAINS**

88.　The problem with WELLS FARGO's employees opening accounts without proper documentation was not an isolated problem with respect to GOMEZ and the Fraud Account.

89.　Rather, it was a systemic problem that WELLS FARGO was fully aware of, but ignored for financial gain, including but not limited to having more access to available cash for lending and other banking business reasons via more customer accounts.

90.　For example, in 2010, the U.S. Government indicted WELLS FARGO for violating the Bank Secrecy Act, 31 U.S.C. § 5311, *et. seq.*, Case No. 10-20165-CR-LENARD, United States District Court, Southern District of Florida, by failing to implement an anti-money laundering compliance program that at a minimum provided:

a)　internal policies, procedures, and controls designed to guard against money laundering;

b)　for an individual or individuals to coordinate and monitor day-to-day compliance with the Bank Secrecy Act and the anti-money laundering compliance program;

c)　for an ongoing employee training program; and

d)　for independent testing for compliance conducted by personnel or an outside party.

91.　The indictment also charged WELLS FARGO with failing to implement programs to verify and record the identity of customers opening accounts so that the bank could form a reasonable belief that it knows the true identities of its customers.

**HERNANDEZ LEE, LLC**
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

92.     The indictment covered WELLS FARGO's conduct from about May 2003 to June 2008, the time period that MENDEZ's money laundering scheme occurred.

93.     WELLS FARGO agreed to pay a significant civil penalty of over $160 million dollars as part of the indictment and entered into a deferred prosecution agreement with the U.S. Government ("Deferred Prosecution Agreement"), a true and correct copy of which is attached hereto as **Exhibit E.**

94.     In connection with entering into the Deferred Prosecution Agreement, WELLS FARGO accepted responsibility for its conduct and the conduct of its employees as set forth in the factual statement attached to the Deferred Prosecution Agreement as Exhibit A, including its conduct in failing to implement an anti-money laundering compliance program and programs to verify and properly identify customers opening accounts.

95.     Interestingly, despite agreeing to implement adequate anti-money laundering compliance programs and programs to correctly record and identify its customers, WELLS FARGO ended up in a 2011 lawsuit, Case No. 502011-CA-13862, 15th Judicial Circuit Court, In and For Palm Beach County, Florida, for firing Susan Steadman, a branch manager, after she noticed and informed WELLS FARGO's management that bank employees were improperly opening bank accounts without proper documentation in violation of the Bank Secrecy Act, which was the subject of the indictment.

96.     WELLS FARGO resolved the lawsuit filed by Susan Steadman via a confidential and undisclosed settlement.

## COUNT I
## <u>MALICIOUS PROSECUTION</u>

97.     GOMEZ incorporates paragraphs 1 through 96 as though fully set forth herein.

98.     On or about April 5, 2011, the U.S. Government arrested GOMEZ in front of his two young daughters and his wife and commenced a criminal proceeding against him based on charges of conspiracy to commit money laundering, conspiracy to structure financial transactions, and structuring financial transactions.

99.     WELLS FARGO's conduct was the legal and proximate cause of the criminal proceeding against GOMEZ.  Specifically, WELLS FARGO provided to the U.S. Government information relating to GOMEZ, including the Summary Sheet, which information WELLS FARGO knew or should have known was incomplete, inaccurate, false and misleading.

100.    The criminal proceeding was terminated in favor of GOMEZ in November 2011, after GOMEZ provided to the U.S. Government information about his Real Accounts with WELLS FARGO, which WELLS FARGO knew of, but did not provide to the U.S. Government and which information GOMEZ used to prove his innocence and obtain a court order dismissing all the charges against him.

101.    The U.S. Government did not have probable cause to initiate the criminal proceeding against GOMEZ and only proceeded with the criminal proceeding against GOMEZ because the incomplete, inaccurate, false and misleading information it was provided by WELLS FARGO falsely linked GOMEZ to the Fraud Account and MENDEZ's money laundering scheme.

102.    WELLS FARGO acted maliciously when it provided to the U.S. Government information linking GOMEZ to the Fraud Account despite knowing that the information it was providing was incomplete, inaccurate, false and misleading.

103.    Further, WELLS FARGO acted maliciously when it failed to inform the U.S. Government, *inter alia*, that: (i) GOMEZ did not open the Fraud Account, (ii) the Fraud Account was opened by MENDEZ and/or other WELLS FARGO employees without GOMEZ's authorization and without the documentation and approvals required for opening an account, (iii) MENDEZ and/or other WELLS FARGO employees twice changed the address on file for GOMEZ without GOMEZ's authorization and without the documentation and approvals required for changing an address, (iv) MENDEZ had improperly removed monies from the S/R and B-B Accounts and laundered some of the monies through the Fraud Account, (v) MENDEZ and others were able to issue checks on the Fraud Account using a signature that did not match GOMEZ's signature on file after a WELLS FARGO employee made a note of the questionable GOMEZ signature on the first check by number and second check by date drawn on the Fraud Account, and (vi) MENDEZ and others continued using a questionable GOMEZ signature to write checks on the Fraud Account after a WELLS FARGO employee noted the questionable GOMEZ signature on the first check by number and second check by date drawn on the Fraud Account.

104.    GOMEZ suffered significant damages as a result of WELLS FARGO's conduct, including but not limited to economic and non-economic damages associated with being arrested, incarcerated and placed on house arrest for almost eight (8) months.

HERNANDEZ LEE, LLC
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

**WHEREFORE**, GOMEZ respectfully requests the Court enter judgment in his favor and against WELLS FARGO and award GOMEZ economic and non-economic damages in excess of $75,000.00, punitive damages, attorney's fees and costs associated with the underlying criminal proceeding, costs in this action, pre-judgment interest, and such further relief the Court deems just and appropriate.

## COUNT II
## FALSE IMPRISONMENT

105.    GOMEZ incorporates paragraphs 1 through 96 as though fully set forth herein.

106.    On or about April 5, 2011, the U.S. Government arrested GOMEZ in front of his two young daughters and his wife, detained him in a federal prison for almost two (2) weeks and placed him on house arrest for almost eight (8) months before he cleared his name of all charges brought against him.

107.    GOMEZ's arrest and detention was against his will.

108.    Moreover, GOMEZ's arrest and detention were unreasonable and unwarranted under the circumstances as outlined in this complaint, were without legal authority and were caused and/or instigated by WELLS FARGO's conduct.

109.    More specifically, GOMEZ's arrest and detention were caused by WELLS FARGO, *inter alia*, (i) knowingly providing to the U.S. Government information and a Summary Sheet that falsely stated that the Non-Gomez and Fraud Accounts were GOMEZ's accounts, (ii) knowingly providing to the U.S. Government information and a Summary Sheet that was incomplete in that it failed to provide information about GOMEZ's Real Accounts, which information GOMEZ used to prove his innocence and that he had nothing to do with the Fraud

HERNANDEZ LEE, LLC
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

Account and the money laundering schemed devised and implemented by MENDEZ, (iii) falsely informing the U.S. Government that the California and Kendall Signature Cards were signed by GOMEZ in connection with the Fraud Account, (iv) knowingly failing to inform the U.S. Government that the Fraud Account was opened under GOMEZ's name without his authorization and without the proper documentation and approvals, (v) knowingly failing to inform the U.S. Government that the Kendall address on file for GOMEZ was changed twice without GOMEZ's authorization and without proper documentation and approvals, and (vi) knowingly failing to inform the U.S. Government that MENDEZ and others were able to use a questionable GOMEZ signature to write checks on the Fraud Account after a WELLS FARGO employee noted the questionable GOMEZ signature on the first check by number and second check by date drawn on the Fraud Account.

110.    WELLS FARGO's conduct outlined herein was not a good faith mistake.  To the contrary, WELLS FARGO's conduct was done with utter disregard of GOMEZ's rights and liberties, was reckless and outrageous and was done with knowledge that the information being provided to the U.S. Government was inaccurate, incomplete, false and misleading.

111.    GOMEZ suffered significant damages as a result of WELLS FARGO's conduct, including but not limited to economic and non-economic damages associated with being arrested, detained and placed on house arrest against his will.

**WHEREFORE**, GOMEZ respectfully requests the Court enter judgment in his favor and against WELLS FARGO and award GOMEZ economic and non-economic damages in excess of $75,000.00, punitive damages, attorney's fees and costs associated with the underlying criminal

proceeding, court costs, pre-judgment interest, and such further relief the Court deems just and appropriate.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

112.    GOMEZ incorporates paragraphs 1 through 96 as though fully set forth herein.

113.    On or about April 5, 2011, the U.S. Government arrested GOMEZ in front of his two young daughters and his wife, detained him in a federal prison for almost two (2) weeks and placed him on house arrest for almost eight (8) months before he cleared his name of all charges brought against him.

114.    GOMEZ's arrest and detention were the direct result of inaccurate, incomplete, false and misleading information provided by WELLS FARGO to the U.S. Government.

115.    More specifically, GOMEZ's arrest and detention were caused by WELLS FARGO, *inter alia*, (i) knowingly providing to the U.S. Government information and a Summary Sheet that falsely stated that the Non-Gomez and Fraud Accounts were GOMEZ's accounts, (ii) knowingly providing to the U.S. Government information and a Summary Sheet that was incomplete in that it failed to provide information about GOMEZ's Real Accounts, which information GOMEZ used to prove his innocence and that he had nothing to do with the Fraud Account and the money laundering schemed devised and implemented by MENDEZ, (iii) falsely informing the U.S. Government that the California and Kendall Signature Cards were signed by GOMEZ in connection with the Fraud Account, (iv) knowingly failing to inform the U.S. Government that the Fraud Account was opened under GOMEZ's name without his authorization and without the proper documentation and approvals, (v) knowingly failing to

-26-
**HERNANDEZ LEE, LLC**
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

inform the U.S. Government that the Kendall address on file for GOMEZ was changed twice without GOMEZ's authorization and without proper documentation and approvals, and (vi) knowingly failing to inform the U.S. Government that MENDEZ and others were able to use a questionable GOMEZ signature to write checks on the Fraud Account after a WELLS FARGO employee noted the questionable GOMEZ signature on the first check by number and second check by date drawn on the Fraud Account.

116.    WELLS FARGO's conduct of providing to the U.S. Government information that WELLS FARGO knew or should have known was inaccurate, incomplete, false and misleading was done with reckless and utter disregard for GOMEZ's rights and liberties, and was outrageous and beyond all bounds of decency.

117.    Further WELLS FARGO's conduct caused GOMEZ to suffer severe emotional distress as a result of being arrested for the first time in his life, incarcerated in a federal prison for almost two (2) weeks, placed on house arrest for approximately eight (8) months and facing charges that could have landed him in federal prison for twenty (20) years had he not been lucky enough to find information about his Real Accounts, which he used to help clear his name of all charges.

118.    Certainly, WELLS FARGO knew that providing the U.S. Government with false information linking GOMEZ to the Fraud Account, which was used by MENDEZ and/or others to launder monies in violation of the law, would result in GOMEZ's arrest and incarceration and the resulting severe emotional distress suffered by GOMEZ.

**WHEREFORE**, GOMEZ respectfully requests the Court enter judgment in his favor and against WELLS FARGO and award GOMEZ economic and non-economic damages in excess of

HERNANDEZ LEE, LLC
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

$75,000.00, punitive damages, attorney's fees and costs associated with the underlying criminal proceeding, court costs, pre-judgment interest, and such further relief the Court deems just and appropriate.

### COUNT IV
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

119.    GOMEZ incorporates paragraphs 1 through 96 as though fully set forth herein.

120.    GOMEZ, as a customer of WELLS FARGO, has a special relationship with WELLS FARGO.  More specifically, WELLS FARGO had a fiduciary duty to GOMEZ to keep his account information private, confidential and from being misused by others, including MENDEZ and other WELLS FARGO employees and to not disclose false and misleading information about him, which falsely implicated him in a money laundering scheme orchestrated by MENDEZ.

121.    WELLS FARGO breached the fiduciary duties it owed GOMEZ when it allowed MENDEZ and others to misuse GOMEZ's account information to launder monies in violation of federal and state law and provided information relating to GOMEZ to the U.S. Government that it knew or should have known was inaccurate, incomplete, false and misleading.

122.    Certainly, WELLS FARGO could foresee that its failure to keep GOMEZ's account information private, confidential and from being misused by MENDEZ and others to launder money in violation of federal and state law and its failure to provide accurate, complete and truthful information about GOMEZ to the U.S. Government would result in GOMEZ being arrested, detained and charged with money laundering.

123.    Moreover, WELLS FARGO could certainly foresee that by breaching the fiduciary duties it owed GOMEZ, GOMEZ would suffer and did suffer a physical impact when he was arrested by federal authorities on or about April 5, 2011, before his two young daughters and his wife and would suffer and did suffer severe emotional distress and economic damages as a result of being arrested, detained and placed on house arrest for almost eight (8) months.

124.    WELLS FARGO knew the Fraud and Non-Gomez Accounts did not belong to GOMEZ, knew about GOMEZ's Real Accounts, knew that GOMEZ did not sign any paperwork authorizing the opening of the Fraud Account or the two address changes to the Fraud Account, knew the Fraud Account was opened by MENDEZ and others without proper approvals and documentation, and knew MENDEZ and others were involved in a money laundering scheme that implicated the Fraud Account.

125.    WELLS FARGO, however, did not inform the U.S. Government that GOMEZ did not have anything to do with the Fraud Account or the money laundering scheme relating to the Fraud Account, information that would have proved GOMEZ was innocent of the charges brought against him by the U.S. Government.

126.    Instead, WELLS FARGO provided the U.S. Government with inaccurate, incomplete, false and misleading information linking GOMEZ to the Fraud Account and MENDEZ's money laundering scheme.

127.    WELLS FARGO's conduct was the cause of GOMEZ being arrested, detained, placed on house arrest and experiencing a physical impact during his arrest and suffering severe emotional and economic damages as a result of his arrest, detention, being placed on house arrest and facing charges that could have landed him in federal prison for twenty (20) years.

HERNANDEZ LEE, LLC
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

**WHEREFORE**, GOMEZ respectfully requests the Court enter judgment in his favor and against WELLS FARGO and award GOMEZ economic and non-economic damages in excess of $75,000.00, attorney's fees and costs associated with the underlying criminal proceeding, court costs, pre-judgment interest, and such further relief the Court deems just and appropriate.

## COUNT V
## NEGLIGENT RETENTION AND/OR SUPERVISION

128.    GOMEZ incorporates paragraphs 1 through 96 as though fully set forth herein.

129.    On or before November 2005, MENDEZ and others devised and implemented a scheme to steal monies from WELLS FARGO's customers' accounts and to launder the stolen monies in violation of applicable federal and state law.

130.    The scheme devised and implemented by MENDEZ and others continued from on or before November 2005, until June 2006, when MENDEZ ceased working with WELLS FARGO.

131.    From the inception of to the end of the scheme devised and implemented by MENDEZ, WELLS FARGO knew or should have known of the scheme, including that fact that the scheme involved the improper use of GOMEZ's private and confidential account information and identity and was falsely implicating GOMEZ as being a party to the scheme when he was not.

132.    More specifically, during the course of the scheme, WELLS FARGO knew or should have known, *inter alia*, that MENDEZ (i) was stealing monies from the S/R and B-B Accounts, (ii) improperly laundering some of such monies through the Fraud Account, which was improperly opened by MENDEZ and/or other WELLS FARGO employees without

**HERNANDEZ LEE, LLC**
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

GOMEZ's authorization and without proper documentation and approvals; and (iii) causing the monies improperly deposited in the Fraud Account to be depleted over a five month period, despite clear signs showing fraud with respect to the Fraud Account during its first month of existence.

133.   WELLS FARGO owed GOMEZ, a customer, a duty to properly supervise MENDEZ and to make sure MENDEZ and others did not improperly misuse GOMEZ's private and confidential account information and improperly use GOMEZ's name and identity to perpetuate a money laundering scheme.

134.   WELLS FARGO breached its duties to GOMEZ when it failed to properly supervise MENDEZ, resulting in MENDEZ perpetuating a money laundering scheme under GOMEZ's name.

135.   As a result of WELLS FARGO's failure to properly supervise MENDEZ in a manner so as to prevent the money laundering scheme and the misuse of GOMEZ's information and identity, MENDEZ was allowed to perpetuate a fraud under GOMEZ's name from November 2005 to April 2006, which WELLS FARGO knew or should have known about by 2008 when WELLS FARGO provided to the U.S. Government inaccurate, incomplete, false and misleading information linking GOMEZ to the Fraud account and MENDEZ money laundering scheme.

136.   Further, WELLS FARGO's failure to properly supervise MENDEZ and to stop and timely report the scheme to the U.S. Government resulted in GOMEZ being arrested and suffering a physical impact during the arrest, detained in federal prison for almost two (2) weeks

and placed on house arrest for almost eight (8) months, which resulted in GOMEZ suffering sever emotional and economic damages.

WHEREFORE, GOMEZ respectfully requests the Court enter judgment in his favor and against WELLS FARGO and award GOMEZ economic and non-economic damages in excess of $75,000.00, attorney's fees and costs associated with the underlying criminal proceeding, court costs, pre-judgment interest, and such further relief the Court deems just and appropriate.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

137.    GOMEZ incorporates paragraphs 1 through 96 as though fully set forth herein.

138.    GOMEZ, as a customer of WELLS FARGO, has a special relationship with WELLS FARGO.  More specifically, WELLS FARGO had a fiduciary duty to GOMEZ to keep his account information private, confidential and from being misused by others, including MENDEZ and other WELLS FARGO employees and to not disclose false and misleading information about him, which falsely implicated him in a money laundering scheme orchestrated by MENDEZ.

139.    WELLS FARGO breached the fiduciary duties it owed GOMEZ when it allowed MENDEZ and others to misuse GOMEZ's account information to launder monies in violation of federal and state law and provided information relating to GOMEZ to the U.S. Government that it knew or should have known was inaccurate, incomplete, false and misleading.

140.    WELLS FARGO knew or should have known about MENDEZ's money laundering scheme, including the fact that MENDEZ was misusing GOMEZ's private and confidential information as part of the scheme.

HERNANDEZ LEE, LLC
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

141.    More specifically, WELLS FARGO knew or should have known, *inter alia*, that MENDEZ (i) was stealing monies from the S/R and B-B Accounts, (ii) improperly laundering some of such monies through the Fraud Account, which was improperly opened by MENDEZ and/or other WELLS FARGO employees without GOMEZ's authorization and without proper documentation and approvals; and (iii) causing the monies improperly deposited in the Fraud Account to be depleted over a five month period, despite clear signs showing fraud with respect to the Fraud Account during its first month of existence.

142.    WELLS FARGO, however, ignored MENDEZ's scheme and the signs of fraud being perpetuated under GOMEZ's name.  Further compounding the problem, WELLS FARGO falsely informed the U.S. Government that GOMEZ was connected to MENDEZ's money laundering scheme when it knew that was not the case.

143.    WELLS FARGO's conduct in failing to protect GOMEZ's information from being misused by MENDEZ and then falsely informing the U.S. Government that the GOMEZ was involved in MENDEZ's money laundering scheme despite knowing otherwise, was reckless and outrageous and was done with utter disregard for GOMEZ's rights and liberties.

144.    Further WELLS FARGO's breach of its fiduciary duties to GOMEZ resulted in GOMEZ being arrested and suffering a physical impact during the arrest, detained in federal prison for almost two (2) weeks and placed on house arrest for almost eight (8) months, which resulted in GOMEZ suffering severe emotional and economic damages.

**WHEREFORE**, GOMEZ respectfully requests the Court enter judgment in his favor and against WELLS FARGO and award GOMEZ economic and non-economic damages in excess of $75,000.00, punitive damages, attorney's fees and costs associated with the underlying criminal

HERNANDEZ LEE, LLC
200 SOUTH BISCAYNE BLVD., SUITE 4410, MIAMI, FLORIDA 33131 – TEL: (305) 842-2100 – FAX: (305) 842-2105

proceeding, court costs, pre-judgment interest, and such further relief the Court deems just and appropriate.

### DEMAND FOR JURY TRIAL

GOMEZ demands a jury trial on all issues so triable.

Respectfully submitted,

**HERNANDEZ LEE, LLC**
*Counsel for Plaintiff Carlos Gomez*
200 South Biscayne, Blvd., Suite 4410
Miami, Florida 33131
Phone: (305) 842-2100
Facsimile: (305) 842-2105

By: _____s/  Jermaine A. Lee_____
    **Jermaine A. Lee, Esq.**
    Florida Bar. No.: 0850861
    jlee@hernandezlee.com
    **Eric A. Hernandez, Esq.**
    Florida Bar No.: 340730
    eric@hernandezlee.com